DURHAM *v.* CLARK.

5-3600                                                      393 S. W. 2d 769

Opinion delivered September 20, 1965.

*Wootton, Land & Matthews,* for appellant.

*Travis Mathis,* for appellee.

ED. F. MCFADDIN, Associate Justice. This is a malpractice case. Linda Clark was a little girl eight years of age when the appellants, Drs. Durham and Murray performed an operation on her leg in June 1962, which operation is the cause of this malpractice action. When Linda was fifteen months old she suffered an attack of poliomyelitis, which retarded the growth of her *left* leg. From 1957 to 1962 the appellants examined Linda from time to time, and finally recommended an operation on Linda's *right* leg, which was the good one. Linda's left leg had not grown in length as rapidly as had her right leg. It was the opinion of the appellants that they would

perform an operation on the right leg, known in medical terminology as "Blount staple epiphyseal arrest," whereby staples were to be inserted in the epiphyseal plate to arrest the growth in the right leg. It was the prognosis that the left leg would continue to grow and the operation would retard the growth of the right leg, and thus in a few years Linda would have both legs equal in length.

The operation was performed on June 29, 1962, in a hospital in Hot Springs, but appellants operated on the wrong leg. This fact they frankly admit. As a result of the operation Linda claims that her condition was worsened instead of improved; and by her father (John Clark), as next friend, she filed this action[1] for damages for malpractice.

The appellants in their answer frankly conceded that they operated on the wrong leg: "they admit that the left leg which was the leg in which there was a retarded growth was inadvertently stapled when it was the right leg that was intended to be stapled." We can find nothing in the record that shows how the mistake occurred. But the appellants claim that no damage resulted from the mistake and they prayed that the complaint against them be dismissed. Trial to a jury resulted in a verdict and judgment in favor of Linda and against the appellants in the sum of $50,000.00; and on this appeal the appellants urge only these two points:

"I. There was no permanent damage to Linda Clark.

"II. The award of $50,000 in favor of Linda Clark, a minor, was grossly excessive, contrary to all of the medical testimony in the case, and should be reduced to such sum as would fairly represent the damages as proven by the evidence."

We will have no necessity to consider the matter of legal liability for malpractice since the only points relate to the evidence as to damages and the amount of the

---

[1] Her father and mother, Mr. and Mrs. John Clark, also sought damages, but the only verdict was for Linda individually and that is the one here involved.

verdict; and we will consider these two points together. Appellants insist that the mistake in the operation was discovered while Linda was still in the recovery room; that she was returned to the operating room, again anesthetized, and within 45 minutes the six staples were removed, which had been mistakenly placed in her bad leg;[2] and that they thereby prevented permanent damage to Linda. The appellants testified that Linda has not and will not suffer any permanent injury from their mistake. A number of doctors supported the appellants in this latter point, and one could almost conclude that some of the witnesses would lead the jury to believe that the mistake made by the appellants was a benefit to Linda rather than a detriment. But the jury saw the little girl and there was ample evidence that the operation was a detriment; that as a result of it Linda will be permanently impaired; and that she has suffered and will suffer mentally and physically as a result of the malpractice. Linda testified, without objection:

"Q. Now, Linda, before the operation could you get around and play with the other children, like to play ball and other games with the children?

"A. Yes, sir.

"Q. Can you do that now?

"A. No, sir.

"Q. Before the operation, Linda, did you have to support your knee in any way to walk around?

"A. No, sir.

"Q. After you walk around now—walk for a distance now, do you have to support your knee?

"A. Yes, sir.

"Q. How do you do that, Linda?

"A. Well, I put my left hand on my left leg."
Linda's father, Mr. John Clark, testified:

---

[2] Still no pins were placed in the good leg, as was the original purpose of the operation.

"Q. Have you observed any difference in the manner in which she gets around now than she did before the operation?

"A. Very much so.

"Q. Would you describe to the jury the difference that you have noted?

"A. Well, before they operated on her she used to be able to get out and run and play ball, and walk and do most anything that any other normal child could do; but since that time, even up to now, it gets worse. She can't get around near as good as she did. If she walks a block and a half or two blocks, well, her leg gets tired or something. She puts her left hand on her knee to support it, and she don't run and play ball with the boys like she used to because she just can't get around.

"Q. Did you ever notice her place her hand on her knee for support before the operation?

"A. No, sir."

Linda's mother, Mrs. John Clark, testified:

"Q. Now, have you noticed any difference in the manner in which she gets about now and the manner in which she got about before the operation?

"A. Yes, sir.

"Q. And explain to the jury what difference you have noticed.

"A. Well, she just can't run and play like she used to. She used to get out and play ball with the boys, and well, do almost everything that normal children do, but she just can't do it now. She can walk just a little piece, maybe a block and a half or two blocks at the most, and that leg begins to hurt, and she just can't do it. She just can't walk any further, or play like other children.

"Q. Does she in any way support her leg?

"A. Yes, she does, with her hands.

"Q. Have you noticed any difference in her attitude now after she has walked for some distance than her attitude before?

"A. I most certainly have. She gets gripy and grumpy and just won't walk. She complains that her leg is tired and she just gives out."

A qualified orthopedic specialist had examined Linda in October 1963, in January 1964, and again in August 1964. He testified:

"Q. All right. Now, Doctor, my question again is, based upon your background and training, your experience, and your examination of Linda Clark, do you have an opinion based upon a reasonable medical certainty, as to the cause of this knock-kneedness and the condition you found upon her in August?

"A. The cause is obvious. I mean, you can't operate on anybody without inflicting a certain amount of trauma.

"Q. And do you attribute the condition which you found in August, 1964, as being a result of the operation performed on June 28, 1962?

"A. It . . . appears to be so.

"Q. What is your opinion, Doctor?

"A. I think it is."

There is evidence of an increasing physical defect and the opinion of the expert that the condition is the result of the malpractice operation. While the appellants had a vast amount of expert opinion to the contrary, the jury was free to decide whom to believe; and there is ample competent evidence to support the jury verdict both as to permanent damages and the amount thereof.

Affirmed.

The Chief Justice would reduce the judgment to $25,000.00.

CARLETON HARRIS, Chief Justice (dissenting). I would reduce the amount of judgment to $25,000.00 for

the reason that I do not feel that Linda Clark suffered permanent injury because of the error made by the surgeon. Dr. John H. Hundley testified that the major portion of disparagement in leg length could be corrected; *i.e.*, there was no permanent damage. Dr. Joe F. Shuffield stated that he did not attribute any of the shortness as a result of the pinning, and did not think that the stapling of the left leg in any way produced a weakness. It was his opinion that Linda's condition was due solely to the polio attack. Dr. Samuel B. Thompson likewise attributed her muscular weakness to poliomyelitis rather than the operation. Dr. Walter P. Blount of Milwaukee, former President of the American Academy of Orthopedic Surgeons,[1] and present Vice-President of the International Orthopedic Society,[2] testified that, in his opinion, the error committed had no ill effect on the limb, other than to produce scars. He also stated that the growth of the left thigh bone was temporarily accelerated. It was his opinion that Linda had not sustained any weakening of the left leg as a consequence of its having been stapled. Dr. Blount also testified that there was still time to correct the disability caused by the polio.

The only doctor who disagreed at all with these findings was Dr. Bennett. However, even Dr. Bennett testified that he felt the condition which he found could be corrected:

"I told her that we would probably have to wait until about summer before we would know. It looks like that approximately this summer that you can work on the good leg, then at that time correct the knock-knee on the bad leg. I think it will probably be this summer. It may be that she will wait a little longer. It depends on how much she develops."

The testimony of the doctors referred to convinces me that even if the mistake made in operating on Linda's

[1] The stapling procedure used on the normal leg, and which was the purpose of the operation on Linda, is named after Dr. Blount, and is known as "Blount staple epiphyseal arrest."

[2] Dr. Blount has written several medical articles relating to this subject, and some have been translated into French and German. He has studied in clinics in Europe, South America, and Canada, in addition to numerous clinics in this country.

left leg, instead of the right, caused any damage, there is (or was at the time of the trial) still plenty of time remaining in which to correct the condition.

As stated, I would reduce the judgment to $25,000.00.